Whitaker, Judge,
delivered the opinion of the court:
By the treaty of June 25, 1855 (12 Stat. 963), the plaintiff Indians ceded to the United States all the lands to which they laid claim, except a certain tract which was set apart for their exclusive use. This tract is described as follows:
Commencing in the middle of the channel of the De Chutes Biver opposite the eastern termination of a range of high lands usually known as the Mutton Mountains; thence westerly to .the summit of said range, along the divide to its connection with the Cascade Mountains; thence to the summit of said mountains; thence southerly to Mount Jefferson; thence down the main branch of De Chutes Biver; heading in this peak, to its junction with De Chutes Biver; and thence down the middle of the channel of said river to the place of beginning.
The setting apart of the above-described lands as a reservation for them was, however, subject to the following proviso:
Provided, however, That prior to the removal of said Indians to said reservation, and before any improvements contemplated by this treaty shall have been com *29 menced, that if the three principal bands, to wit: the Wascopum, Taih or Upper De Chutes, and the Lower De Chutes bands of Walla-Wallas shall express in council a desire that some other reservation may be-selected for them, that the three bands named may select each three persons of their respective bands, who with the superintendent of Indian Affairs or agent as may by him be directed, shall proceed to examine, and if another location can be selected, better suited to the condition and wants of said Indians, that is unoccupied by the whites, and upon which the board of commissioners-thus selected may agree, the same shall be declared a reservation for said Indians, instead of the tract named in this treaty.
The plaintiff alleges that in pursuance of the agreement contained in this proviso another tract was selected. This tract embraces the reservation which the defendant claims is the one described above and, in addition, a very large territory, some three or four times larger.
1. The first question presented is whether or not the tribe-did in fact select a reservation other than the one above-described.
There is no proof whatever in the record that the bands named in the proviso met in council and expressed a desire that some other reservation should be selected for them, as the treaty required. The extent of plaintiff’s proof is that Indian Agent E. E. Thompson, together with the chiefs and a number of the principal men of the bands included' in the treaty, went upon the reservation and that there Thompson pointed out to them its boundaries. Plaintiff’s proof, therefore, is not that another reservation was selected, but only that the boundaries of the reservation described in the treaty,, as pointed out to them by the Indian Agent, were not the boundaries contended for by the defendant. There is no proof that the Indians selected any reservation other than that described in the treaty. Since no other reservation was-selected, the plaintiff is bound by the description of the reservation as contained in the treaty.
The trip of the Indian Agent and the chiefs and principal men of the tribes to the reservation was made some two years after the treaty was signed. Even if it be true that on this trip the Indian Agent pointed out to them boundaries other *30 than those described in the treaty, this cannot vary the terms of that written instrument accepted by them two years before. There is no proof nor allegation that these boundaries were pointed out to them before the treaty was signed.
Moreover, plaintiff’s evidence of what happened on this trip is unsatisfactory. A't the time testimony in this case was taken there was but one person living who had accompanied the Indian Agent on this trip, one Albert Kuckup, 100 years old. He testified that the Indian Agent pointed -out to them as their reservation the lands marked in green on the map filed as exhibit “B” to plaintiff’s petition, beginning at Little Dark Butte on the summit of the Cascade Bange; running thence southwardly through Olallie Butte, Mt. Jefferson, Three Fingered Jack, The Three Sisters, to Koo-See Wah Turn or Horse Lake; and thence south and east to the Paulina Mountains; thence northwardly through Powell Butte, Grizzly Butte, How-Sash, and Shnip-Shee or Bake Oven; thence westwardly to the point of beginning. Even though this would be material, if true, it is evident from his testimony and from the testimony of other witnesses for the plaintiff that this trip was not for the purpose of selecting some other reservation, but for the purpose of exploring the reservation described in the treaty.
This is also evident from Thompson’s report on the trip to Joel Palmer, Superintendent of Indian Affairs for the Oregon territory. In the beginning of his letter he stated that he had just returned from “an exploration of the Wasco or Warm Springs reservation.” Thompson says nothing in his report about exploring any part of the country other than the reservation which the defendant insists was set apart for them. From his letter it would appear that the purpose of the trip was primarily to select grounds for the Indian settlement. He says that for this purpose they selected two places south of Warm Springs, one on the She-tike Creek, and another in a valley about two miles west, where the She-tike empties into the De Chutes River. Both of these settlements .are within the reservation which the defendant contends was .set apart for them. (See exhibit “B” to plaintiff’s petition.)
The treaty of 1855 contained a proviso that the Indians *31 should have the exclusive right to fish in the streams running through or bordering the reservation; and also, “at all other usual and accustomed stations, in common with citizens of the United States,” they were to have “the privilege of hunting, gathering roots and berries, and pasturing their stock on unclaimed lands, in common with citizens.” It is not at all clear from Kuckup’s testimony whether the land pointed out to the exploring party was the land set apart to them as a reservation, as they claim, or were the lands in which they had a right to hunt and fish and gather roots and berries. According to the testimony, the Indians did hunt and fish and gather berries within the territory described by Kuckup during the summer, but in the winter they returned to the settlements selected for them within the boundaries of the reservation as claimed by the defendant.
Plaintiff introduced other witnesses who testified to the boundaries of the reservation as reported to them by this delegation, or to boundary marks which they had seen on the ground; but their testimony adds nothing to the testimony of Kuckup.
The plaintiff’s proof completely fails to establish the selection of any reservation other than that described in the treaty.
2. The next question presented is the boundaries of the reservation described in the treaty. The question of the southern and eastern boundaries is comparatively easy of determination. The defendant contends that the southern boundary begins at the headwaters of Jefferson Creek in Mt. Jefferson, and runs thence along this creek to the Metolius Kiver, and thence along this river to its junction with the De Chutes Kiver. The plaintiff contends that it begins at the headwaters of a stream rising in The Three Sisters, and running thence with that stream to its junction with the De Chutes Kiver. We think defendant’s contention is correct. The boundaries as described in the treaty read in part as follows:
* * * thence southerly to Mount Jefferson; thence down the main branch of De Chutes Kiver: [,] heading in this peak, to its junction with De Chutes Kiver. * * *
*32 The plaintiff says that the main branch of the De Chutes Diver does not rise in Mt. Jefferson, but rises in The Three Sisters and, therefore, that we should disregard Mt. Jefferson as the southern terminus of the western boundary, and continue that boundary to The Three Sisters.
It is true the stream rising in Mt. Jefferson is not designated on the map filed as exhibit “B” to plaintiff’s petition as a branch of the De Chutes Diver, but, nevertheless, the stream there rising empties into the De Chutes Diver, and well might have been thought of as a branch thereof. This must have been the stream in the minds of the parties when the treaty was drawn because it is perfectly clear that the southern terminus of the western boundary of the reservation is Mt. Jefferson, and not The Three Sisters, which is about twice as far from the northern terminus of the western boundary as is Mt. Jefferson.
If it be correct to say that Mt. Jefferson is the southern terminus of the western boundary, then it follows necessarily that the southern boundary of the reservation runs from Mt. Jefferson along the Jefferson Creek until it empties into the Metolius Diver, thence along this river to its junction with the De Chutes Diver, and that the eastern boundary runs northwardly up the De Chutes Diver to the terminus of the eastern boundary.
3. The proper location of the northern boundary is much more difficult to determine.
It was originally surveyed to within several miles of the western boundary by T. B. Handley in 1871. Later his survey was extended by Campbell from Handley’s 26-mile post in a due west course to the summit of the Cascade Mountains. The Indians were much dissatisfied with these surveys and, accordingly, on December 17, 1886, a new survey was ordered, which was made by John A. McQuinn in the following year. His survey included a substantial amount of land in addition to that included by Handley.
The white settlers were dissatisfied with this survey and, to settle the dispute, the General Land Office and the Indian Office ordered representatives of their two offices, H. B. Martin and George W. Gordon, to determine which line “would *33 nearest conform to the treaty.” They reported that the Handley line “more nearly conforms to the requirements and conditions of the treaty, but that at certain places he is materially at variance with its terms and intentions.” They recommended a line which conformed in part with the Hand-ley line and in part with the McQuinn line, but which was at variance with both in material respects. The McQuinn line was substantially in accord with the claims of the Indians and, to satisfy them, the Department of the Interior on July 19, 1889 approved the line as established by him.
Following this, in 1890 (26 Stat. 336, 355) Congress authorized the appointment of a commission—
* * * whose duty it shall be to visit and thoroughly investigate and determine as to the correct location of the northern line of the Warm Springs Indian Reservation,_ in the State of Oregon, the same to be located according to the terms of the treaty of June twenty-fifth, eighteen hundred and fifty-five.
The Commission appointed pursuant thereto filed a detailed report on June 8,1891, in which they said:
That the line known as the McQuinn line, as surveyed and run, in no respect conforms to the said treaty of 1855, and is not the line of the northern boundary of the Warm Springs Reservation or of any part thereof. That the fine known as the Handley line, as surveyed and run, substantially and practically conforms to the calls of the said treaty of 1855 from the initial point of said line up to and including the twenty-sixth mile thereof.
$ * $ ‡ $
It is therefore considered and declared by the Commission that the northern boundary of the Warm Springs Indian Reservation, in the State of Oregon, is that part of the line run and surveyed by T. B. Hand-ley in the year 1871, from the initial point up to and including the twenty-sixth mile thereof, thence in a due west course to the summit of the Cascade Mountains.
On the incoming of this report, Congress on June 6, 1894 passed an act (28 Stat. 86) which provided:
* * * That the true north boundary line of the Warm Springs Indian Reservation * * * is hereby declared *34 to be that part of the line run and surveyed by T. B. Handley, in the year eighteen hundred and seventy-one, from the initial point up to and including the twenty-sixth mile thereof; thence in a due west course to the summit of the Cascade Mountains, as found by the commissioners, Mark A. Fullerton, William H. H. Dufur, and James F. Payne. * * *
Notwithstanding such'congressional adoption of this line, the appropriation act of March 2,1917 (39 Stat. 969) appropriated $5,000—
* * * for an investigation and report on the merits of the claim of the Indians of the Warm Springs Reservation in Oregon to additional land arising from alleged erroneous surveys of the north and west boundaries of their reservation * * * and the Secretary of the Interior is hereby authorized to make such surveys or resurveys as may be necessary to complete said investigation and report.
Pursuant thereto United States Surveyor Fred Mensch was appointed to make this investigation. He reported on January 16, 1919, going into the controversy in detail. He criticized the Handley survey in a number of respects, and concluded that the McQuinn line was the proper northern boundary;
Following this the Commissioner of the General Land Office filed a detailed report criticizing the Mensch report, and concluded that the plaintiff was not “entitled to any land or to any indemnity under the terms of the treaty of June 25,1855, as construed by Congress in the act of June 6,1894, outside of the present Handley-Campbell north and west boundaries of said reservation.”
Lastly, Congress on December 23, 1930, passed an act (46 Stat. 1033) conferring jurisdiction on this court to adjudicate the claims of the Indians—
* * * notwithstanding the provisions of the Act of June 6,1894 (Twenty-eighth Statutes, page 86) * * *,
under which the Handley-Warm Springs Commission line was adopted.
It will thus be seen that we are confronted with a problem quite difficult of solution.
*35 The treaty defines the northern boundary as follows:
Commencing in the middle of the channel of the De Chutes River opposite the eastern termination of' a range of high lands usually known as the Mutton Mountains; thence westerly to the summit of said range, along the divide to its connection with the-Cascade Mountains; thence to,.the summit of said mountains.
In establishing this line two difficulties are met with: (1). the determination of the point in the De Chutes River “opposite the eastern termination of a range of high lands usually known as the Mutton Mountains”; and (2) what was meant by the phrase “along the divide to its connection with the Cascade Mountains.”
In the region there is one main divide, that between the-White River and its tributaries on the north, and the Warm Springs River and its tributaries on the south. It seems, evident that the northern boundary was intended to run along this divide, and it would seem that, having established the starting point, it would be fairly simple to run the line to its western terminus. Difficulty, however, is encountered due to the fact that at a point about 18 miles from the Cascade Mountains on the west the main divide between the Warm Springs and White River systems divides into spurs, some running northwardly and others southwardly to, or approximately to, the De Chutes River. In this territory there are a number of creeks which flow into neither the White River nor the Warm Springs River, but into the De Chutes River on the east, so that there is no continuous east and west divide running the entire distance from the De Chutes River to the Cascade Mountains (See particularly the map filed as exhibit “B” to plaintiff’s petition, the topographical map filed as plaintiff’s exhibit “A”, and the diagram accompanying Fred A. Mensch’s report, enclosure No. 49 to the report of the Secretary of the Interior dated November 2, 1933, which diagram is reproduced and filed as an appendix to this opinion.)
Beginning on the north, these creeks are Wapinitia Creek, Nena Creek, an unnamed creek, Eagle Creek, and the An-token Creek on the south. The headwaters of both Eagle *36 Creek and Nena Creek are considerably south, of any possible starting point, so that if the divide between any two of the creeks is strictly followed until it intersects with the main divide between the White Eiver system and the Warm Springs Eiver system, the northern boundary would •dip far to the south on its westward course. On the other hand, if the spur to the north is followed, the line would •shoot far to the north of an east-west course. The chief ■difficulty lies in running the line from the point where the main divide discontinues its east-west course to the point on the De Chutes Eiver.
But, before settling this question, let us determine the starting point on the De Chutes Eiver. This is described as a point in the De Chutes Eiver opposite the eastern termination of the Mutton Mountains. Handley fixed this as a point on the river between the mouths of Antoken Creek and Eagle Creek; McQuinn fixed it several miles north, at a point on the De Chutes Eiver between the mouths of Wapi-nitia and Nena Creeks. We are of opinion that the point fixed by Handley is substantially correct. McQuinn in fact originally fixed his starting point twenty chains south of Handley’s point, instead of six miles north thereof. He changed it only because the Indians were greatly dissatisfied with it and threatened to destroy all corners that he might establish, if it were adhered to. To meet this situation the Indian .Agent was instructed by the Indian Office to undertake to arrive at an understanding with the Indians. They insisted that the beginning point was farther north between the mouths of Wapinitia and Nena Creeks, and this was agreed to and adopted by McQuinn, but only in order to satisfy them, and not because he thought it was where the treaty designated the beginning point to be.
The report of the Warm Springs Commission states:
The initial point of the McQuinn line is located in the De Chutes Eiver opposite a range of low lands or hills called “Neena Hills,” some 10 or 12 miles north of and down the De Chutes Eiver from the eastern termination of Mutton Mountains. This line does not touch the range of highlands known as Mutton Mountains at any point, and runs without reference to summit or divide, sometimes along and sometimes across a range of lowlands or hills.
*37 Since his starting point was not opposite “the eastern termination” of the Mutton Mountains, it must be rejected. The testimony shows that the Mutton Mountains run in a northeasterly and southwesterly direction, and not east and west. The northeasterly termination of this range of mountains, according to the topographical map filed as plaintiff’s exhibit “A”, is in the neighborhood of the point established by Handley, and in the neighborhood of the point originally established by McQuinn before he encountered the opposition of the Indians. These mountains do not extend to the point finally adopted by McQuinn. Handley’s starting point is the northernmost point of these mountains immediately on the De Chutes River, and it is as far east as any other point in the range.
Everyone who has surveyed this northern boundary or investigated the surveys thereof agrees that this is approximately the proper beginning point according to the terms of the treaty, with the sole exception of Mensch. He thinks McQuinn’s starting point, as finally adopted, is correct, but, as we have stated, McQuinn adopted this point not because he thought it was the beginning point as defined by the treaty, but only to satisfy the Indians. The Indians claimed that this was the proper beginning point because it was the point pointed out to them by Indian Agent Thompson, but we do not regard this as material, since this was done two years after the treaty was signed. Mensch undertakes to justify it by showing that from this point a divide can be followed to the Cascade Mountains; but this is not conclusive because a divide can be followed to these mountans from other places opposite the Mutton Mountains on the De Chutes River. The fact that a divide can be followed from McQuinn’s starting point to the Cascade Mountains is nullified by the fact that it is not opposite “the eastern termination” of the Mutton Mountains. Nor do the hills opposite this point extend to the De Chutes River. The Mutton Mountains to the south extend considerably to the east of the eastern termination of these hills.
After careful consideration of all the testimony we are of opinion that the starting point fixed by Handley is substantially correct.
*38 From this point the treaty provides that the line runs to the summit of the Mutton Mountains; and thence “along the divide to its connection with the Cascade Mountains.” As heretofore stated, if the divide or watershed is strictly followed, the northern boundary twice would dip far to the south, since the headwaters of Eagle Creek and Nena Creek are far to the south of the starting point. We are convinced that this was not intended by the parties. We are of opinion that the parties intended that the northern boundary should run in a fairly straight line in a general east and west direction. There is attached to the report of the Secretary of the Interior in this case, dated November 2, 1938, enclosure No. 49, a sketch of the Warm Springs Eeservation used by General Palmer when he negotiated the treaty with the Indians, which sketch is filed herein as appendix No. 1 to this opinion. This sketch shows a range of mountains on the north of the reservation, which runs in an almost due east and west direction from the De Chutes Eiver to the Cascade Mountains. We think the parties relied upon this sketch as showing the approximate course of the northern boundary. Palmer himself was but slightly familiar with the country. The Indians were somewhat more familiar with it. They no doubt were familiar with the general course of the divide between the Warm Springs Eiver system and the White Eiver system, because this divide is fairly well defined, but it is extremely doubtful that any of them knew that the east-west divide discontinued on the eastern part of the reservation. In the west it runs from the Cascade Mountains in a direction slightly south of east, in a fairly straight line.
We feel sure the parties contemplated that the northern boundary would run in a fairly straight line in a general ■east and west direction. It is not reasonable to suppose that any of them thought that it would dip far to the south or north as it approached the eastern boundary. Their idea of its course must have been substantially that shown on General Palmer’s sketch. The divide from the Cascade Mountains on the west to the point where it discontinues its easterly course and breaks up into spurs, being known and being substantially in accord with General Palmer’s sketch, we think was in the minds of the parties when the treaty was signed. *39 But we have no reason to tbink that any of the parties knew that this divide broke off into widely divergent spurs as it approached the eastern boundary. They believed, we think, that it continued on in its general easterly course to the De Chutes River, as was indicated on General Palmer’s sketch.
We are of the opinion, therefore, that when the point is reached where the divide ceases its east and west course and breaks up into spurs, the divide should be abandoned and a straight line run from this point -to the initial point on the De Chutes River. This is the course the White River-Warm Springs River divide would have taken had it continued its course to the De Chutes River. This line approximately bisects the area bounded by Wapinitia Creek on the north and the Antoken Creek on the south, with their corresponding ridges. It is substantially, we think, what was in the minds of the parties when the treaty was signed.
No survey has exactly followed the divide between the White River and Warm Springs River systems from the Cascade Mountains to the end of its east-west course, hut McQuinn’s survey substantially does so. From his 7%-mile corner, where the blazed tree pointed out by Indian Agent Thompson is supposed to have stood, his line runs in a straight line to his 30-mile post, which is on the summit of the Cascade Mountains at Little Dark Butte. By reference to Mensch’s “Diagram accompanying the Investigation Report of the north and west boundaries of the Warm Springs Indian Reservation, Oregon,” filed as an appendix hereto, it will be observed that McQuinn’s line runs slightly north of the divide from his ten-mile post to his twenty-mile post, and from this point to between his 23rd and 24th mile post it runs to the south, and from this point on, to the north of the divide. He has erred both on the one side and the other. It, however, substantially conforms tv the terms of the treaty, and we are of opinion that considerations of justice and equity, as well as of putting an end to uncertainity and further litigation, dictate that we adopt his line as the true northern boundary from his thirty-mile post at Little Dark Butte to his 7%-mile post. From this point to the initial point as established by Handley we think the northern boundary should run in a straight line.
*40 4. There remains' the question of the western boundary. The western boundary is described in the treaty as running from the northwestern corner of the reservation “southerly to Mt. Jefferson.” It is open to question whether or not the treaty intended that it should run in a direct line from the northwestern corner to Mt. Jefferson, or should run in a southerly direction to Mt. Jefferson along the summit of the Cascade Mountains. Although the summit of the Cascade Mountains is not mentioned, there is some warrant for saying the line should run along it, because of this: The Indians ceded to the United States a large tract of land, the western boundary of which is described as follows:
Commencing in the middle of the Columbia River, at the Cascade Falls, and running thence southerly to the-summit of the Cascade Mountains; thence along said summit to the forty-fourth parallel of north latitude.
From this tract there was reserved the reservation the-boundaries of which are in dispute. Since the western boundary of the land ceded the United States was the summit of the Cascade Mountains, it would appear reasonable to suppose that the parties understood the western boundary of the Indian reservation to be the summit of the Cascade Mountains.
However, both Campbell and McQuinn have run the western boundary on a straight line from their respective northwest corners to Mt. Jefferson. Campbell’s line runs most of the way to the east of the summit of the Cascade Mountains. McQuinn’s western boundary would include within the reservation considerable territory to the west of the-Cascade Mountains toward the northern part of the reservation, and immediately to the south would exclude approximately an equivalent amount of territory east of the summit of these mountains, and thereafter would run sometimes slightly to one side and sometimes slightly to the other side of the summit of these mountains. (See diagram accompanying Mensch’s report heretofore referred to.)
Although there is doubt that McQuinn’s western boundary is in exact accord with the intention of the parties-when the treaty was signed, we think it does substantial

*0

*41 justice, and for this reason and to avoid another survey of these boundaries we adopt McQuinn’s western boundary line as the true western boundary of the reservation.
We therefore conclude that the defendant has appropriated to its own use all of the lands to the north of the Handley-Campbell line, and south of the true north boundary as herein defined, and the plaintiffs are entitled to recover the value thereof. The defendant has also appropriated to its own use all of the lands between the Campbell line on the west and the true western boundary as herein defined, and the plaintiff is entitled to recover the reasonable value thereof.
The plaintiffs are not entitled to recover for any rights secured to them in the territory outside of the reservation as herein defined.
5. Under the treaty of 1855 the defendant agreed to expend for the benefit of the Indians the sum of $150,000 and to erect certain buildings and to furnish certain equipment, and to furnish and pay certain employees. The plaintiff alleges that these obligations have not been discharged, but its proof is insufficient to support the allegations. The report of the General Accounting Office shows that far more has been spent than is called for by the treaty. Even though the defendant may not have erected the precise buildings called for, the offsets to which the defendant would be entitled far exceed the value of these buildings.
The plaintiff is not entitled to recover on these claims.
We conclude as a matter of law: (1) that the northern boundary runs from McQuinn’s 30-mile post at Little Dark Butte along the line established by him to his 7%-mile post, and thence in a straight line to the starting point on the De Chutes River established by Handley; (2) that the western boundary is the western boundary established by McQuinn; (3) that the plaintiff is entitled to recover the value of the lands between these boundaries and the northern and western boundaries established by Handley and Campbell; and (4) the plaintiff is not entitled to recover on its other claims. It is so ordered.
Madden, Judge-, Jones, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.