Collins, Judge,
delivered the opinion of the court:
Plaintiff, an Indian tribal organization formed under the Indian Reorganization Act,[1] is the successor in interest of a confederation known as the Flathead Nation. This suit arises out of a treaty which the Flathead Nation concluded with the United States in 1855.[2] The treaty was ratified on March 8, 1859,[3] and, pursuant to it, a vast amount of land was ceded to the United States by the Flathead Nation. In ¿addition, the treaty provided for the establishment of an Indian reservation.[4] The primary issue in this action is whether certain of the reservation boundaries, as surveyed by the United States, are in accord with the requirements of the treaty. Specifically, we must consider plaintiff’s assertion that the existing boundaries on the north and on the southwest of the reservation are incorrect.
*400 The Northern Boundary
The portion of the treaty which describes the northern boundary is as follows: “* * * to a point due west from the point half way in latitude between the northern and southern extremities of the Flathead Lake; thence on a due east course to [a designated divide]. * * This boundary was surveyed in 188V by United States Deputy Surveyor Edmund Harrison. Harrison determined the north-south midpoint of Flathead Lake, and the boundary line was extended from this point to the east and to the west. According to plaintiff, the existing north boundary is located too far south. Plaintiff claims that, because of this error, more than 4,200 acres of land and water were excluded from the reservation. In a report filed on August 7, 1964, Trial Commissioner Richard Arens concluded that plaintiff had failed to establish by a preponderance of creditable evidence that:
* * * the location of the northern boundary of the Flathead Reservation, as it was laid out by Mr. Harrison in 1887, was not “to a point due west from the point half way in latitude between the northern and southern extremities of the Flathead Lake” as such extremities existed in 1887, and was not within acceptable limits of error.
Thus, with regard to the northern boundary, our trial commissioner accepted the position put forth by defendant. We are unable to agree with the conclusion reached by the trial commissioner.
One matter in controversy is the proper location of the northern and southern extremities of Flathead Lake. With regard to chronology, plaintiff correctly observes that Harrison should have endeavored to ascertain the position of the extremities as of 1859, the year the Treaty of Hell Gate was ratified.[5] Plaintiff contends that the “best evidence” *401 of the location of the 1859 end points consisted of certain meander lines.[6] For the northern extremity, plaintiff nsed a meander line reflected on an 1872 survey; for the southern extremity of the lake, a meander line from a 1905 survey was utilized.[7]
Defendant’s experts, on the other hand, dispute the validity of the end points used by Morrison-Maierle, Inc., plaintiff’s engineering experts. According to defendant, the major shortcomings of those end points are the facts that they relate to two different years and that neither pertains to 1859. Defendant points out that “the only evidence of the simultaneous location of the north and south extremities of the lake is [Harrison’s survey] * * * made in 1887.”
We are of the opinion that, under the peculiar circumstances of this case, plaintiff is justified in using as the extremities of the lake the two meander lines in question. First, it is proper to utilize the meander line of 1872 as the northern extremity. The record indicates that, on the north side of Flathead Lake, the topography was such that the water level was subject to substantial fluctuation. Also, it can be assumed that the meander line itself changed over the decades. Nonetheless, we agree that the 1872 meander line is the “best evidence” of the 1859 extremity, because the 1872 survey was closer in time to the date of treaty ratification than was the Harrison survey or any of the other surveys considered.
Secondly, in view of the nature of the south end of Flathead Lake, use of the 1905 meander line is warranted. There, in contrast to the north end, the banks are quite steep, and the record indicates that the shoreline on the south has been stable. Thus, it appears that the 1905 meander line is, as plaintiff asserts, satisfactory evidence of the location in 1859 of the shoreline. Therefore, with respect to both extremities, we accept the views urged by plaintiff.
*402 The conclusion of plaintiff’s consulting engineers was that Harrison had placed the northern boundary 821.04 feet too far south on the west side of the lake and 1,281.89 feet too far south on the east side of the lake. Defendant’s attack upon this conclusion is twofold. We have already rejected the first of defendant’s arguments, i.e., that regarding the invalidity of the end points used by plaintiff. The second argument of defendant is that any errors committed by Harrison were within acceptable limits of tolerance. This assertion must also be rejected.
A substantial part of the difference between Harrison’s boundary line and that which plaintiff proposes can be attributed to a computational mistake on the part of Harrison. In utilizing his field notes to compute the location of the north end of the lake, Harrison made a mistake of 14.87 chains. The effect of this miscalculation was to place the center of the lake 7.18 chains (i.e., one-half of 14.37) too far south.
Defendant argues that the discrepancy between (1) the figures shown on Harrison’s field notes and (2) the distance he determined does not necessarily indicate that the northern boundary was misplaced. In answer to this .argument, it is sufficient to refer to the fact that defendant’s experts, Bernard F. Locraft, Civil Engineers, stated the following-in their August 27, 1963, report: “Based on Harrison’s survey notes we find that he made a 7.18 chain mistake in locating the north boundary line.” Even though defendant’s consulting engineers acknowledged the arithmetical mistake, their ultimate position was that Harrison’s boundary was within reasonable tolerances. There is a basic fallacy in this position; i.e., although tolerances are intended to allow for such matters as errors inherent in surveying instruments, it is improper to assert that arithmetical mistakes are likewise covered by tolerances.
Defendant’s experts have admitted that Harrison’s incorrect computation affected his determination of the midpoint of the lake. Since under no circumstances can this arithmetical mistake be excused on the ground of tolerances, it follows that there is no basis for applying tolerances to the *403 wnsting boundary, a line which reflecta the computational mistake.[8]
Defendant argues that:
* * * The midpoint was not determined as of 1859 and cannot now be determined. This point was first determined in 1887 by Harrison. There is no way now that plaintiff can show that the midpoint of Flathead Lake was farther north in 1859 than that point was determined to be by Harrison in 1887.
For the reasons stated above, we have found that the argument of defendant is incorrect and that plaintiff’s experts have succeeded in demonstrating where Harrison should have placed the midpoint. Accordingly, plaintiff is entitled to recover.[9]
The SoxjthwesteRN Boundary
The treaty description of the boundary on the southwest is as follows:
* * * thence along the divide separating the waters flowing into the Bitter Boot Biver from those flowing into the Jocko to a point on Clarke’s Fork between the Camash and Horse prairies; thence northerly to, and along the divide bounding on the west the Flathead Biver * * *.
This boundary was surveyed in 1893 by Deputy Surveyor George Scheetz. Defendant concedes that the instructions which Scheetz had received from the Surveyor General of the United States were erroneous and that, as a result, approximately 11,900 acres of land and water were omitted from the reservation. However, plaintiff’s claim is not limited to the 11,900 acres.
According to plaintiff, the treaty language regarding the southwestern boundary is ambiguous. Plaintiff asserts that *404 the historical evidence presented by its experts resolves the ambiguity and demonstrates that a total of approximately 93,000 acres was excluded from the reservation. We cannot accept the argument of plaintiff.
It is significant that initially there was substantial agreement among the consulting engineers employed by plaintiff and those employed by defendant. In its November 20, 1961, report to plaintiff, Morrison-Maierle, Inc., stated the opinion that the survey of the southwestern boundary did not comply with the calls of the treaty and “that if compliance were had, no less than about 11,900 acres in addition would have been included.” According to the report, the estimate of 11,900 acres was based upon a boundary which went to the closest point on Clarke’s Fork the point nearest the confluence of the Flathead and the Bitter Root Rivers). Plaintiff’s experts did state that “perhaps some lower * * * [point] could be .sustained.” Thus, the initial opinion of Morrison-Maierle, Inc., was not an unqualified one. Nonetheless, in the November 20, 1961, report, there was no real suggestion that the description of the southwestern boundary was “ambiguous.” As stated above, defendant’s consultants reached a conclusion substantially in accord with that first proposed by plaintiff’s experts. This original agreement among the experts of the two litigants is not decisive of the question of interpretation of the treaty, but it is a persuasive indication (1) that the proper location of the boundary is ascertainable without undue difficulty and (2) that the extent of the omission was approximately 11,900 acres.
Moreover, plaintiff admits that the boundary which it now urges does not meet all the calls of the treaty. Plaintiff asks us to hold, on the basis of its historical evidence, that Horse Prairie and adjacent lands should have been included within the reservation. Under plaintiff’s view, the boundary would go along the Clarke’s Fork River to a point marking the western edge of Horse Prairie. 'Such a line would clearly fail to meet the requirement that the point on Clarke’s Fork be “between the Camash and Horse prairies,” for Camash Prairie is located east of Horse Prairie.[10]
*405 We are of the opinion that the proper boundary line is that accepted by defendant, i.e., the line which goes to the nearest point on the Clarke’s Fork River. It is correct, as plaintiff points out, that in going “to, and along the divide bounding on the west the Flathead Eiver,” this line does not go in a precisely “northerly” direction. Still, we agree with defendant that the description “northerly to, and along the divide * * *” is a general one, and that the boundary originally proposed by plaintiff’s experts meets this general description as well as the other requirements of the treaty. In determining the boundary, it is imperative to consider all, not just some, of the calls of the treaty. When this is done, the description of the southwest boundary is sufficiently free of ambiguity.
In fact, although plaintiff refers to “resolving an ambiguity,” it would appear that plaintiff is really seeking to have us set aside the wording of the treaty and substitute in its place a substantially different description. This we are unwilling to do. Cf. Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 353 (1945). Our task in the present case is to construe the language of the treaty, not to rewrite it. Furthermore, the result would be the same even if we were to deem proper resort to plaintiff’s historical evidence. Various of the documents gathered by Morrison-Mairele, Inc., do suggest that the Upper Pend d’Oreilles, one of the tribes which participated in the treaty negotiations, did inhabit the area of Horse Prairie (or Horse Plains). However, plaintiff’s evidence, including the map prepared by Hazard Stevens, is not adequate to prove that Horse Prairie was to be included within the reservation. Thus, whatever our view regarding ambiguity, plaintiff’s claim with respect to Horse Prairie must fail.[11]
*406 CONCLUSION
In conclusion, plaintiff is entitled to recovery consistent-with this opinion, and the amount of plaintiff’s judgment is-; to be determined pursuant to Rule 47 (c). With regard to, the northern boundary, we have accepted plaintiff’s view as: to the location of the midpoint of Flathead Lake, and plaintiff’s recovery is to be based upon a boundary line which runs; from that midpoint. Regarding the southwest boundary,, the basis of recovery is to be the line proposed in the November 20, 1961, report of plaintiff’s experts and accepted by-defendant’s experts.
The precise amount and the value of the acreage “taken”" from plaintiff will be determined in the Rule 4-7 (c)¡ proceedings.
FINDINGS.Or FACT
The court, having considered the evidence, both reports-of Trial Commissioner Richard Arens, and the briefs and' argument of counsel, makes findings of fact as follows:
.1. On July 30, 1946, there was enacted H.R. 6983, Public Law 566 of the 79th Congress, 2d Session, section 1 of which, reads:[1]
* * * That jurisdiction is hereby conferred upon the Court of Claims, subject to review by the Suprenie Court of the United States on writ of certiorari as in other-cases, to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims of whatsoever nature which the Confederated Salish and Kootenai Tribes of Indians of the Flathead Reservation of Montana, or any tribe or band thereof, may have against the United States.
2. Plaintiff is an Indian tribal organization which was organized under the Indian Reorganization Act of 1934[2] and"' is the legal successor in interest to the tribes confederated; under the name of the Flathead Nation.
*407 3. (a) On July 16, 1855, the Flathead Nation concluded a treaty with the United States in which there was ceded to the United States a vast area of land located within the present borders of the states of Montana and Idaho theretofore held under aboriginal title.
(b) Article 2 of the treaty reserved from the land ceded,, for the use and occupation of the confederated tribes and as; a general Indian reservation, “the tract of land included, within the following boundaries, to wit
Commencing at the source of tfie main branch of the-Jocko Eiver; thence along the divide separating the-waters flowing into the Bitter Eoot Eiver from those? flowing into the Jocko to a point on Clarke’s Fork between the Camash and Horse prairies; thence northerly to, and along the divide bounding on the west the Flathead River, to a point due west from the point half way in latitude between the northern and southern extremities-, of the Flathead Lahe; thence on a due east course to the divide whence the Crow, the Prune, the So-ni-el-em and the Jocko Eivers take their rise, and thence southerly along said divide to the place of beginning. [Italics-added.]
All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said confederated tribes as an Indian-reservation. * * *
(c) The treaty was ratified March 8,1859, and proclaimed April 18,1859.
Northern Boundart
4. (a) On April 27, 1887, the Surveyor General of the United States gave written instructions to his deputy surveyor, Edmund Harrison, concerning the survey of certain boundaries of the reservation. These instructions included the following:
After determining the latitude, personally of the Northern and Southern extremities of said lake, you will then compute the distance between your points of observations at the Northern and Southern extremities of the Lake, and as a check upon said computation you will actually measure the whole distance and determine the midway point from your measurement, or if it is impossible from lack of means or other conditions to measure the whole distance, at least one half of said com *408 puted distance must be measured, and as a further check upon your said measurement, you will observe the latitude of the Midway Point as determined by your measurement. If your latitude observation agrees with the latitude as determined 'by measurement you will have determined the Midway Point desired.
* * # * *
You will also make at least two connections with the public surveys, if at any time your line falls within three miles of said public surveys.
(b) The survey was commenced on June 27,1887, and was completed on July 12,1887. The deputy surveyor, Edmund Harrison, kept detailed field notes.
(c) The cottonwood and pine posts which, according to the field notes, marked the observing stations at the north end and south end, respectively, of the lake (extending from north to south approximately 26 miles) have not been found.
5. (a) At the trial, plaintiff produced the expert testimony of Mr. John H. Morrison and of Mr. Roy L. Bandy. Mr. Morrison is a member of Morrison-Maierle, Inc., Helena, Montana, consulting engineers, which firm in 1961 was employed by plaintiff to determine if the boundaries of the Flathead Reservation had been properly drawn. Mr. Bandy was engaged to assist Morrison-Maierle, Inc., in its above-mentioned employment by plaintiff.
(b) In 1961 after its employment by plaintiff, Morrison-Maierle, Inc., assembled data from various surveys which had been made adjacent to Flathead Lake. These surveys were made in 1872, 1899, 1903, 1905, 1906, 1912, and 1937. Thereafter, Mr. Morrison and Mr. Bandy made a field inspection to determine the location of the meander comers[3] established by the surveys.
(c) Morrison-Maierle, Inc., concluded that “the most southerly point on the Lake was found to be the most southerly point on the meander line established in April 1905 by the U.S. General Land Office Survey” and that “the most *409 northerly point on the north end of the Lake” was marked by a meander comer established by the U.S. General Land Office in November 1872. Morrison-Maierle, Inc., then prepared a table of “latitudes and departures” beginning at the south end of the lake and following the section lines around both the east side and west side of the lake to the north end. A check of the longitudinal distance was made between the north and south ends of the lake by use of certain triangulation points [4] established by the U.S. Coast and Geodetic Survey Department near the lake shore. Morrison-Maierle, Inc., then concluded that the northern boundary of the reservation had not been correctly surveyed in 1887 in accordance with the calls of the treaty and that it had been placed 821.04 feet too far south on the western side of the lake and 1,231.89 feet too far south on the eastern side of the lake.
(d) Morrison-Maierle, Inc., did not make an independent field survey of the boundaries of the reservation.
6. (a) Mr. Morrison testified in detail respecting the technical procedures and computations used by Morrison-Maierle, Inc., in reaching its conclusion that the northern boundary of the reservation had been placed too far south in 1887.
(b) Mr. Morrison also testified that Mr. Harrison made a “mistake” of 14.37 chains[5] in measuring and in computing from Ms field notes the length of the lake, and that this would account for 473.88 feet of the alleged error in location of the north boundary on the west side of the lake.
(c) The testimony of Mr. Bandy in general corroborated the testimony of Mr. Morrison. Both Mr. Morrison and Mr. Bandy testified in effect that the quality of the work of Mr. Harrison in his survey was below standard.
7. (a) At the trial, defendant produced the expert testimony of Mr. Walter Wayne Osborne and of Mr. William H. Bichards. Mr. Osborne is a partner in Bernard F. Locraft, a Washington, D.O., firm of civil engineers which was engaged by defendant to check various reports made to plaintiff by Morrison-Maierle, Inc. Mr. Bichards was engaged to assist the firm of Bernard F. Locraft, Civil Engineers, in connection with its employment by defendant.
*410 (b) After its employment by defendant, Bernard F. Lo-craft, Civil Engineers,- studied the reports of Morrison-Maierle, Inc., and the field notes of the survey made by Mr. Harrison, but did not make a field trip to the reservation.
(c) A report, dated January 24, 1963, to defendant from Bernard F. Locraft, Civil Engineers, concludes as follows:
Along the northern boundary, the line was established at a different location than that which would be fixed by today’s modem surveying methods by 'approximately the amount claimed. It is our opinion, however, that when allowable tolerances for errors, always present in any survey, are considered and proper allowance made therefor, and when proper allowance is made for the value of the land bemg surveyed, the mid parallel of the Lake was fixed with sufficient accuracy for the purpose at that time. The basis for this opinion is more fully explained in our report on this error.
(d) A report, dated January 26, 1963, to defendant from Bernard F. Locraft, Civil Engineers, sets forth the methods used by the latter to check the computations and conclusions reached by Morrison-Maierle, Inc. It is clear from the body of this report that the computations and conclusions reached by Bernard F. Locraft, Civil Engineers, are based on an assumption of the correctness of the various surveys and records used by Morrison-Maierle, Inc. The firm of Bernard F. Locraft, Civil Engineers, does not, however, concede the correctness of such surveys and records. The report reads in part as follows:
To better understand the significance of the above, it is necessary to consider the difference between a mistake and an error. No surveying measurement is exact. Absolute accuracy can never be attained and the differences between the results of a correctly executed survey and the exact theoretical values are the errors. In any surveying measurement, instrumental errors arise from imperfections in the instruments and devices with which the measurements are taken; personal errors occur through the observer’s inability to perform his work exactly ; natural errors occur from variations in the phenomena of nature such as temperature, wind, refraction, and magnetic declination. All of these errors working together form the resultant error in the survey, which resultant error is the difference between the measured and the true value.
*411 Mistakes 'are unintentional faults of conduct arising from poor judgment or from confusion in the mind of the observer. Mistakes should be detected and eliminated by adequately checking the work. Errors cannot be eliminated but their magnitude can and should always be kept within certain tolerances.
The limite of tolerance within which the allowable error must be kept for any given survey depend on many considerations including the value of the land being surveyed, the difficulty of performing the work, the time allotted, and the cost of the work. For a measure of whát tolerance should be allowed in fixing the mid parallel of Flathead Lake reference was m'ade to the “Manual of Instructions for the Survey of the Public Lands of the United States 1947” published by the U.S. Department of the Interior, Bureau of Land Management, * * *. This manual gives the tolerances for surveys of sections in a township. * * *
* * * * *
The above allowable tolerance for the distance between comers of 25 links in 40 chains is, when expressed as a fraction, %60. This tolerance is for a survey made today with improved surveying techniques and high land values. For a survey made in 1878 when surveying techniques left much to be desired and land had a much smaller value, an allowable tolerance of V63 or %6 seems reasonable. This is particularly true in view of the fact that the data taken from the public land records from which the above values were computed failed to close by 8.27 chains and that the points chosen to mark the ends of the Lake were in all probability different from those existing at the time of the signing of the Treaty or surveying of the Reservation boundary.
* * * * *
In conclusion, we find that the northern boundary of the Flathead Indian Reservation was, by errors in the survey monumenting the boundary, fixed some distance too far south. The magnitude of these errors cannot be conclusively determined because the locations of the ends of the Lake cannot be conclusively fixed, but it can be demonstrated that the errors are within reasonable tolerances for this work.
(e) A report, dated March 13, 1963, to plaintiff from Morrison-Maierle, Inc., reads in part as follows:
‘With reference to the northern boundary of the reservation, the engineers [Bernard F. Locraft, Civil Engineers] readily admit that the boundary is established too *412 far south, but they express their belief that the errors made in establishing it are within the tolerances approved by the U.S. General Land Office for public land surveys made at that early date. In support of their theory they quote Section 162, from Page 187 of the Manual of Instructions for the Survey of the Public Lands of the United States, published by the Bureau of Land Management, Department of the Interior, in 1947. We disagree with their interpretation of the Manual on this sub j ect. We do not believe that the limits approved by Section 162 of the Manual (1/160) were intended to apply to surveys such as Mr, Harrison * * * was making at that time. We believe that a close reading of the Manual will disclose that Section 162 was dealing with:
“previously surveyed township boundaries on which new subdivisional lines were to close”;
more liberal tolerances being authorized in such cases to avoid setting two sets of section corners along an old surveyed line. * * * Section 234 on Page 237 of the Manual of 1947, which in our opinion, defines the maximum limits of closure authorized for original surveys of the public lands, e.g., 1/640, or 12% links per mile. Inci-dently, the previous Manual of Surveying Instructions issued by the U.S. General Land Office in 1902, likewise prescribes the closing limits as 1/640; 50 links per square mile, and 3.00 chains per township (6 miles square). * * *'
* * * * *
The actual difference between the present north boundary and the mid-latitudinal line between the north and south ends of the lake amounts to errors, when expressed as a fraction of the distance is found to be 1 over 86 (1/86) on the west side of the lake, and 1 over 63 (1/63) on the east side; eight to ten times greater than the authorized tolerance stated above. We believe these large errors are due to gross mistakes by Harrison. Other mistakes of much greater ratio have been found in Harrison’s line projecting the northern boundary line westward to the Flathead Eiver divide. * * *
(f) A report, dated August 27, 1963, to defendant from Bernard F. Locraft, Civil Engineers, disclaims agreement with Morrison-Maierle, Inc., “on most essential points.” The report continues in part as follows:
The point set at the north end of the lake between Sections 20 and 21 by A. J. Everley in 1872 and the *413 point set on the meander line in Section 3 at the south end of the lake by William K. Trippet in 1905 cannot be taken as the ends of the lake at any one given time since the water levels at these periods might differ greatly. The middle point of the lake thus established could be considerably different from where it should be. It tends to be too close to the end where the water mark was higher. * * *
Our use of these points as the assumed north and south ends in our report and the computations and accompanying maps based thereon should not be interpreted that we agree they are in any way correct. We used them to test the validity of the plaintiff’s claim only because they were readily available (Morrison-Maierle, Inc. had used them) but it must be recognized that neither they nor the conclusions based upon them as shown on our drawings Nos. 3570-3, 3570-4, 3570-5, 3570-6 and 3570-7 and as shown in Morrison-Maierle, Inc. Report, are correct. _ They were simply points which were tied to the Public Land Surveys which could be used to estimate the magnitude of the lands omitted, if any.
* * * * *
Harrison’s notes give two values from the north end of the lake to the standard quarter section corner, one being the bearings 'and distances and the other being the distance 1117.85 chains, both as set down in the notes. They disagree by 14.37 chains. * * *
* * * We have no way of comparing the edge of water or high water marks on the date of Harrison’s survey with that on October 1,1931 (the date shown on the R.M.P. Co. Map), but if it can be shown that the end of the lake as established by Harrison on June 28, 1887 was north of the edge of the water on October 1, 1931, then the bearings and distances in the notes would hold and the distance of 1117.85 chains computed by Harrison would be in error by 14.37 chains. If this is so, then Harrison’s establishment of the center of the lake would be in error by one-half that distance or 7.18 chains.
In conclusion we find that based on measurements and meander comers shown in the Public Land Records, it has not been demonstrated that the error in the survey establishing the northern boundary of the Flathead Indian Reservation was greater than that which should be permitted. Based on Harrison’s survey notes we find that he made a 7.18 chain mistake in locating the north boundary line.
*414 8. (a) Mr. Osborne testified in detail respecting the technical procedures and computations used 'by Bernard F. Locraffc, Civil Engineers, in checking the reports by Morrison-Maierle, Inc., and the field notes of the survey made by Mr. Harrison in 1887. He stated in essence that by using the same surveys and data used by Morrison-Maierle, Inc., in establishing the extremities of Flathead Lake, but with “a little difference” in method of computation, the firm of Bernard F. Locraft, Civil Engineers, was in “substantial agreement” with Morrison-Maierle, Inc., on the location of the northern boundary of the reservation. Morrison-Maierle, Inc., concluded that the 1887 survey had placed the northern boundary of the reservation 821.04 feet .too far south on the western side of the lake and 1,231.89 feet too far south on 'the eastern side of the lake (see finding 5(c), supra).
Bernard F. Locraft, Civil Engineers, concluded that the ¡surveys and data used by Morrison-Maierle, Inc., showed that the 1887 survey had placed tho northern boundary of the reservation 825 feet too far south on the western side of the lake and 1,217 feet too far south on the eastern side of the lake.
(b) Mr. Osborne testified that the difference in the northern boundary of the reservation as found by Mr. Harrison in 1887 and such boundary as found by Morrison-Maierle, Inc., is because Morrison-Maierle, Inc., based its determination of the southern extremity of Flathead Lake on public land records of surveys which “failed to close”
(were in error) by 545.8 feet;[6] and because Morrison-Maierle, Inc., selected as the north end of Flathead Lake a point which, according to a 1962 map by the U.S. Geological Survey, is 2,300 feet south of the water’s edge. Mr. Osborne stated that, as revealed by certain maps, the meander point (water’s edge) at the northern extremity of the lake fluctuates from time to time by 3,620 feet.
(c) Mr. Osborne further testified regarding the “discrepancy” or “variance” of 14.37 chains in the field notes in certain measurements made by Mr. Harrison in 1887.[7] He *415 stated that if one set of such measurements were used, the northern boundary would remain as located in 1887, but that-if another set of such measurements were used the northern boundary would be located 472.4 feet further north on the-west side of the lake; but, that even if an error of 472.4 feet-had been made in the location of the northern boundary on the west side of the lake, such error would be within acceptable limits of error under the standards of the surveying' profession which accepts an error on an existing survey which does not exceed the ratio of 1 over 160. He asserted that the-error, if any, in the 1887 location of the northern boundary of the reservation was in the ratio of 1 over 63.5 on the east side of Flathead Lake and in the ratio of 1 over 86 on the-west side of the -lake. He also stated that the standards for-acceptance of error in surveys were less stringent in 1887 than at present. He said, “It seems to me that a survey made-in virgin country in 1887 which contains an error of the ratio-of one over 86, or one over 63 should not be disturbed, that. this amount of error is acceptable.”[8]
(d) Mr. Richards testified in effect that certain maps-which were in evidence indicated that the water’s edge at the-northern extremity of Flathead Lake had by 1931 moved, southward 1,320 feet from the water’s edge as it existed at the northern extremity of the lake at the time of the survey by Mr. Harrison in 1887.
Southwestern Boundary
9. (a) At the time of the treaty in the general vicinity of' the southwestern boundary of the reservation a river (formerly known as the Bitter Root) flowing northward, joined the Flathead River, flowing northwestward to form the-Clarke’s Fork River, which flowed generally in a northwesterly direction. The name of the old Bitter Root River-has since been changed to Clarke’s Fork River so that the-present Clarke’s Fork River extends the entire length of the-old Bitter Root and Clarke’s Fork Rivers.
*416 (b) Tbe Jocko River is to the east of the aforementioned location of the old Bitter Root River.
(c) About 3 miles northwest of the junction of the old Bitter Root River and Flathead River, Clarke’s Fork River veers westward along the southern border of a large tract sometimes known as Horse Prairie, and then veers northward along the western border of Horse Prairie. Immediately to the east of Horse Prairie is another large tract sometimes known as Camash Prairie.
(d) The treaty calls involved herein are in a northwesterly direction “to a point on Clarke’s Fork between the Camash and Horse prairies.” Thereafter the calls are in a northerly direction to a point which had been established in a survey made in 1887 by Deputy Surveyor Edmund Harrison.
(e) Although the treaty calls for the boundary of the reservation run clockwise, the survey (finding 10(a), infra) was run counterclockwise.
10. (a) The survey of the southwestern boundary of the reservation was run in 1893 by Deputy Surveyor George Scheetz in compliance with instructions from the Surveyor General of the United States.
(b) The line which was run by Mr. Scheetz according to the instructions failed to comply with the calls of the treaty in that the line, which ran from the north along the western border of the reservation, extended from a certain point in a southeasterly direction instead of in a southwesterly direction “to a point on Clarke’s Fork between the Camash and Horse prairies.”
(c) Defendant admits that as a result of the failure of the survey of the southwestern boundary to comply fully with the calls of the treaty there were omitted from the reservation approximately 12,000 acres of land and water as shown by an exhibit developed by plaintiff’s experts after studying the calls of the treaty.
11. (a) The report, dated November 20, 1961, to plaintiff from Morrison-Maierle, Inc., reads in part as follows:
In connection with this report we have studied and considered the Treaty of July 16, 1855, 12 Stat. 975; excerpts from the writings of Governor Isaac I. Stevens, who negotiated the Treaty of 1855; copies of which are annexed; survey instructions issued in connection *417 with, establishing the boundaries of the Reservation; field notes of those surveys; plats of survey; and certain maps hereafter identified. Field work of a limited nature was also engaged in.
* * * * *
After a thorough study of these documents we have come to the conclusion that the river flowing northwesterly from Missoula, Montana, to its juncture with the Flathead River in Section 34, T. 19 N., R 25 W. was then known as the Bitter Root; and the river flowing from Flathead Lake to its juncture with the Bitter Root was then known as the Flathead. The head of the Clark’s [sic] Fork river was at the confluence of these two streams, according to our information.
* * * * *
It is our opinion that the above mentioned Harrison-Scheetz 'survey of the West Boundary of Flathead Reservation from the 79 mile corner was erroneously made by running southerly from the 79 mile corner to the Flathead River instead of to the Clark’s [sic] Fork river as we show it on our Map #859-01-01, sheet 1. We also believe the Survey Instructions issued by the Surveyor General to George Scheetz dated December 5,1892 were in error. „
* * * * *
Had the western boundary been properly surveyed, the line following the divide separating the waters flowing into the Bitter Root and Jocko Rivers would have run northwesterly from near the 87 mile corner at least to the forks of the rivers at the head of the Clark’s [sic] Fork River. (See Map #859-01-01, Sheet 1.) Perhaps some lower “point on Clarke’s Fork” to quote Article II of the Treaty, could be sustained. We find that at minimum the closest point on Clark’s [sic] Fork is indicated by the Treaty.
* * * * *
To answer your inquiry categorically, we are able to state that from a cadastral-engineering point of view we are able to form an opinion as to whether the actual survey of the southwestern boundary of the reservation complies with the calls of the Treaty of Hell Gate of 1855. Based on the facts and circumstances above set forth, it is our opinion that the survey does not comply with those calls, and that if compliance were had, no less than about 11,900 acres in addition would have been included.
*418 (b) At tbe trial, defendant’s counsel stated that the map, #859-01-01, sheet 1, referred to in the above report, “which purports to show the omitted area totaling 11,900 acres is correct and will be accepted by defendant.”
(c) The foregoing map shows the revised southwest border of the reservation running to the point where the old Bitter-Root River joined the Flathead River to form the Clarke’s. Fork River.
12. (a) A report, dated May 9', 1962, to plaintiff from Morrison-Maierle, Inc., reads in part as follows:
Reference is made to our letter of November 20,1961,. in which we made a report of our investigation of the erroneous boundary claims alleged in the petition filed in the United States Court of Claims on behalf of the Confederated Salish and Kootenai Tribes of Flathead. Indian Reservation, Montana.
Since making that report we have discovered new information which we consider of great importance,, and which, in our opinion, gives a much clearer picture of what was in the minds of the participants, when they were discussing the terms of the Treaty. * * *
* * * * *
This newly-located documentary» boundary material clarifies the language used in the Treaty where it describes this portion of the boundary line. The most important part of this newly-located data are the minutes or notes of the Council meeting held on July 9 to 16,. 1855, which was attended by Governor Stevens, representing the United States Government on the one hand, and Victor, Head Chief of the Flathead Nation; Alexander, Chief of the Pend Orielles; and Michelle, Chief of the Kootenai Tribe on the other. These minutes quote verbatim the remarks of each of the individuals, taking part in the discussion, thus indicating the intent, of the parties, which is of utmost importance in interpreting just what lands they intended to include in the reservation. The copy of those minutes was found in the Pacific Northwest Quarterly, Volume 29,1938, Pages 296 to 311, photostatic copies of which are attached hereto. Another source of new evidence is Volume II of the “Life of Isaac Ingalls Stevens by his son, Hazard. Stevens”, published in 1900 by Houghton, Mifflin and Company. This Volume contains pertinent statements by Hazard Stevens, who attended the meetings, and a map of the area made by Governor Stevens, on which Hazard Stevens had superimposed a diagram of the *419 reservation which, shows the position of the western boundary line with reference to Horse Plains.
Additional information bearing on what was considered the western limits of Flathead River and Flathead Valley was found in the Journals of David Thompson, and the Journals of Alexander Henry, explorers of the Northwest Country in 1799 to 1814.
After a careful study of the minutes of the Council Meeting, and the statements and map found in Hazard Stevens’ biography of his father, it is our opinion that from the forks of the rivers, the west boundary line of the reservation was intended to follow “northerly”, to quote from the treaty, down the river far enough to include all of the agricultural and grazing land in the tract known as Horse Plains, which apparently was the traditional home of a large portion of the Upper Pend Oreilles Indians. With that in mind we would fix the point where the boundary line would leave Clark’s [sic] Fork River at the hydrographic divide marking the west boundary of the Lynch Creek drainage area. From there the reservation boundary line would follow “along the divide” marking the western and northern limits of the Lynch Creek drainage area to a junction with the surveyed west boundary of Flathead Indian Reservation, approximately three miles easterly from Baldy Mountain Lookout Tower, in the northern part of T. 21 N., R. 25 W. This would be in agreement with the description of the west boundary of the reservation where it states “along the divide bounding on the west the Flathead River”, inasmuch as earlier explorers consistently show this Horse Plains country to be in the Flathead Valley (see excerpts from the Journals of David Thompson and Alexander Henry).
According to our information, Clark’s [sic] Fork River, for many miles below the mouth of the Bitter-root [sic] River, was at that time still known by the Indians and other local people as the Flathead River; and Horse Plains was then considered a part of Flathead Valley.
We offer the following additional comments in explanation of our conclusion that it was the intent of Governor Stevens to include Horse Plains in the Flathead Indian Reservation:
The minutes of the Council Meeting show that each of the three Indian Chiefs kept holding out •to keep the land they were occupying. None of them would agree to leave their homeland and move to another valley. For several days the Governor *420 bad employed bis most persuasive arguments to get them all to unite on one reservation, but without success. In later days be sometimes resorted to ridicule and attempts to humiliate the chiefs before their subjects in order to gain his point (see Page 305). However, Alexander stubbornly refused to leave the land his people, the Upper Pend Oreilles, were living on.
After eight days of bickering, Governor Stevens had. failed to have them agree to move to one reservation. Finally, on the ninth day, Monday, July 16,1855, Governor Stevens, in order to get some kind of a treaty-signed, agreed to include the land each of the tribes was-then living on as a part of the Flathead Reservation,, subject to the approval of the President, and thus authorized Alexander to continue to occupy Horse Plains,, where, according to our information, a portion of Alexander’s tribe was then living.
* * * * *
The apparent ambiguous or confusing language _ in the Treaty, describing where the West Boundary line-crosses the Clark’s [sic] Fork River, may be accounted for, in part at least, by the Treaty having been already-written up before they were ready to sign it. * * *’
Our rough estimate of the number of acres this recommended change would add to the reservation west, of the surveyed west boundary is 93,000 acres, including-the 11,900 acres we previously reported.
As a result of our investigation of the Hazard Stevens-material and the other newly located documentary material we have found, we have modified our opinion as to the proper position of the southwesterly boundary of the Flathead Indian Reservation. These notes and the Hazard Stevens material threw an entirely different light on the problem. With this’ added information, together with the other substantiating data we found, we-are now able to state categorically that from a cadastral engineering point of view we are able to form an opinion as to whether the actual survey of the southwestern boundary of the reservation complies with the terms of the Treaty of Hell Gate of 1855. Based on the facts and considerations set forth, it is our opinion that the survey does not comply with the terms of the Treaty, and that if compliance were had, approximately ninety-three-thousand (93,000) acres of additional land would have-been included in the reservation.
*421 (b) The foregoing report was accompanied by several documents, including a map on which Morrison-Maierle, Inc., had superimposed a line extending the southwest border of the reservation to a point about 3 miles downstream on the Clarke’s Fork Fiver from the junction of the old Bitter Foot River and the Flathead Fiver. At this point, the Clarke’s Fork River veers westward along the southern border of a large tract sometimes known as Horse Prairie, and then veers northward along the western border of Horse Prairie (see finding 9(c), supra).
13. The report, dated January 24,1963, to defendant from Bernard F. Locraft, reads in part as follows:
We have studied and considered the report of Morrison-Maierle, Inc., Consulting Engineers, Helena, Montana, dated November 20, 1961, entitled “Engineering Feport and Exhibit on Erroneous Survey Claims in the United States Court of Claims No. 50233”, and offer the following comments and conclusion.
* * * * *
While this report is not intended to be a check on the Amended Engineering Report and Exhibits to Erroneous Survey, dated May 9,1962, we have read this report and are of the opinion that the boundary as described in the Treaty is completely satisfied by the line shown on the map entitled “Proposed Fevision of West Boundary and Omitted Lands” in the first report dated November 20, 1961, and that the claims put forth in this amended report are, from a surveying or engineering standpoint, completely without basis.
In conclusion, it is our opinion that the claim that a mistake in the survey omitted about 12,000 acres of land along the West boundary at the junction of the rivers is correct. "Whether the claim for these 12,000 acres should be honored is a legal question.
14. The report, dated January 26,1963, to defendant from Bernard F. Locraft, Civil Engineers, reads in part as. follows:
_ The second parcel of land alleged to have been omitted, lies along the western boundary. In considering this, allegation, the previously quoted description of the Treaty boundaries has been relied upon completely as. that which fixes the boundary.
*422 The Treaty boundary, in order to satisfy the calls in the description of the boundary, must run to the end of the point of land at the junction of the two rivers. Once this point has been reached, the call reading, “Thence along the divide separating the waters flowing into the Bitterroot [sic] River from those flowing into the Jocko, to a point on Clarke’s Fork, between the Camash and Horse Prairies”, has been completely satisfied. The line must then follow the next course reading “Thence northerly to and along the divide bounding •on the west the Flathead River”. There is nothing in -the description to justify following the river in either direction before commencing the satisfaction of this call. There is nothing in the description justifying the •crossing of the river at any point other than this one. 'The Treaty boundary as shown on Drawing No. 3570-1 completely satisfies the description of the boundary in the Treaty, and in our opinion it is not possible, from the surveying standpoint, to interpret correctly the description in any manner which would include more or less land than as shown.
Along the western boundary approximately 11,746.34 acres of land and 343.8 acres of water were mistakenly omitted from the Reservation because the survey did not follow the description of the boundary in the Treaty.
15. The report, dated March 13, 1963, to plaintiff from IMorrison-Maierle, Inc., reads in part as follows:
With reference to the tract of erroneously omitted land lying at the Southwest part of the Reservation, immediately above the junction of the Flathead and Bitterroot [sic] rivers, we note that Locraft Engineers agree with us that the omission was due to a mistake in surveying the boundary line by the Government surveyors. The Locraft Engineers estimate the omitted area as 11,746.34 acres of land, and 343.8 of water, a total of 12,090.14 acres. Our estimate for the omitted area is 11,900 acres. As both the Locraft Engineers and our engineers are using the same basis for establishing the omitted area, we recommend that the slight differences in our estimates be resolved by determining the true acreage either by a field survey or by accepted photo-grammetry methods.
With reference to the rejection of the claim to the Horse Plains and Lynn Creek areas by Bernard Locraft, Civil Engineers, we offer the following comments:
*423 Our research indicates that the Horse Plains tract was considered as a part of the Flathead Indian Reservation, .as .described in the Treaty of July 16, 1855. This is substantiated by the promise made by Governor Stevens, on the last day of the Council Meeting, July 16, 1855 in which Governor Stevens agreed:
“subject to the approval of the President, to let the Indians retain possession of the lands in Horse Plains and in the Bitterroot [sic] Valley on which they were then living.”
Further ¡confirmation of this is found on the map, Page 16, Volume II of the “Life of Isaac Ingalls Stevens”, by his son Hazard Stevens. The map made on a reduced scale from Governor Stevens map of -April 30,, 1851 and sent to the Commissioner of Indian Affairs. The map shows that the Horse Plains area was considered a part of the Flathead Indian Reservation.
Historical records of travelers passing through Horse Plains after the signing of the Flathead Treaty on July 16, 1855, indicate the Indians continued to occupy Horse' Plains for several years after the treaty was signed; thus indicating their belief that it was within the reservation.
16. The body of a letter dated July 2, 1963, to plaintiff from Morrison-Maierle, Inc., reads:
We have discovered an additional map made by Governor Stevens in 1853, 54, 55 which gives a better picture of topography,. drainage, etc. along the southwestern boundary of the Flathead Indian Reservation than any of bur previous maps. This map which Governor Stevens had prepared from his own explorations immediately before the Council Meeting with the Flatheads in July 1855, is most likely the map Stevens had 'before'him when he marked off his ideas of where the boundaries of the Reservation should run. It no doubt ‘depicts the positions of the streams travel routes, prairies and divides in the area around the forks of the Bitterroot [sic] and Flathead Rivers as Stevens invisioned -[sic] them at the; time.
* * * * *
■ It seems logical that he would proceed northward ' aldlig Clarke’s Fork a. ways to include Horse. Plains, a "fiat' area, thence, northerly to the divide showii on the west of Hot Springs Creek, rather than turn abruptly rto the northeast or east at the'forks of the river.
*424 17. The report, dated August 27, 1963, to defendant from Bernard F. Locraft, Civil Engineers, reads in part as follows:
The document titled “Amended Engineering Report and Exhibits to Erroneous Survey”, dated May 9,1962, by Morrison-Maierle, Inc. and filed June 14,1962 in the Court of Claims purports to show that the parties, to the Treaty had in mind a boundary for the reservation different from that described in the Treaty.
Good surveying practice dictates that a surveyor must perform an original survey in conformity with the recognized legal documents describing the tract to be surveyed. The surveyor cannot admit oral evidence locating the line nor his own opinion about where the line should be established when the legal description of said line is clear and sound. The description of the boundary of the Flathead Indian Reservation is both clear and sound making it unnecessary to rely on outside sources.
The Morrison-Maierle, Inc. Amended Report attempts to show that the intention of the parties was to establish the line farther west on the west side of Horses Plains by the use of “hearsay” and “discussion talks” evidence.
If the literal wording in the Treaty is to be set aside in favor of following the intention of the parties it is our opinion that the Treaty line would be left where Harrison and Sheets [sic] surveyed it. . The parties clearly intended that the boundaries in this area would be fixed by the hydrographic divides. * * *
*****
Clearly the boundary of the reservation is to be the divides: that between the Bitter Root and Jocko Rivers, and that which runs generally north and south on the west side of the watershed flowing eastward to the Flathead River. * * *
The precise wording of the treaty is not satisfied by the Harrison and Sheets [sic] surveys however, and if this wording is to be followed the correct boundary would be that described in our report dated January 26, 1963.,
* * * * *
Along the southwest boundary, the present survey probably locates the boundary in accordance with the intention of the parties to the Treaty but does not locate it in accordance with the intention as expressed by the description in the Treaty. Following the literal wording ox the. Treaty would require that the boundary line go to the join of the two rivers.
*425 18. (a) Mr. Morrison and Mr. Bandy repeated at the trial the essence of the material which was set forth in the various reports made by Morrison-Maierle, Inc., to plaintiff. Mr. Morrison testified further that the map, #859-01-01, referred to in the report, dated November 20,1961, to plaintiff from Morrison-Maierle, Inc. (finding 11 (a), supra), was drawn “from the call of the treaty, the wording of the treaty as we understood the treaty at that time” and that the map satisfies the calls of the treaty “as a minimum”; but, the treaty does “not tie this point to this minimum point.” He continued, “It [the treaty] says a point on the Clarke’s Fork River between Camash and Horse Prairie, and thence northerly * * *.” Mr. Morrison stated that the line which was superimposed on the map accompanying the report dated May 9, 1962, to plaintiff from Morrison-Maierle, Inc. (finding 12(a), supra), does not satisfy that call of the treaty which provides that the line should be between the Camash and Horse Prairies, and that the line which was superimposed on the map is west of Horse Prairie.
(b) Mr. Osborne and Mr. Bichards repeated at the trial the essence of the material which was set forth in the various reports made by Bernard F. Locraft, Civil Engineers, to defendant. Mr. Bichards testified further that from the topography of the area and the calls of the treaty he had no difficulty, without any outside explanation, deducing that the southwestern boundary of the reservation should be as set forth in the map #859-01-01, referred to in the report, dated November 20,1961, to plaintiff from Morrison-Maierle, Inc. (finding 11(a), supra).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the amount of recovery to be determined, pursuant to Buie 47 (c), in accordance with this opinion.

 The present action Involves two of the several claims of plaintiff which are founded upon a special Jurisdictional act, the Act of July 30, 1946, ch. 701, 60 Stat. 715.

 Treaty with the Flathead, Kootenay [sic], and upper Pend d’Oreilles Indians, signed July 16, 1855, 12 Stat. 975 (proclaimed April 18, 1859). 'The treaty was concluded at Hell Gate in the Bitter Root Valley.

 A complete description of the boundaries of the reservation Is set forth in finding 3(b), infra. The area ceded by the Flathead Nation is presently within the States of Montana and Idaho.

 For example, Article II of the treaty provides, in part, as follows:
“All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said confederated tribes as an Indian reservation. * * * And the said confederated tribes agree to remove to and settle upon the same within one year after the ratification of this treaty. * * *” The quoted provision is a clear indication that the survey of the general reservation should have taken place in the year following March 8, 1859. The actual survey of the northern boundary did not occur until 1887, or 28 years later.

 For a definition of the term “meander line,” see finding 5(b).

 Both the 1872 survey and the 1905 survey were performed, by the united States General Land Office. Each dealt with a specific area in the vicinity of the reservation; however, neither was intended to be a survey of reservation boundaries as such.

 Since the fact of the computational mistake requires the rejection of Harrison’s boundary, it is unnecessary to determine the degree of tolerance applicable to 1859 or 1887 surreys or to discuss the manner in which Harrison extended his line to the west. Also unnecessary is discussion of our decision in Sioux Tribe of Indians v. United States, 161 Ct. Cl. 413, 315 F. 2d 378, cert. denied, 375 U.S. 825 (1963). However, see Warm Springs Tribe of Indians v. United States, 95 Ct. Cl. 23, 39 (1941).

 using the extremities proposed by plaintiff, defendant’s: consulting engineers determined a boundary line that differed only slightly from that found by Morrison-Maierle, Inc. This difference can be resolved in the Rule 47(c) proceedings.

 Plaintiff's brief refers to another alternative regarding the southwest *405 boundary. This alternative line, which was proposed by one of plaintiff’s witnesses, follows the Clarke’s Fork River to an intermediate point, that is, a point located between (1) that accepted by defendant and (2) that in the vicinity of the western edge of Horse Prairie. Unlike the boundary which encompasses Horse Prairie, the intermediate line is not clearly contrary to the treaty description. On the other hand, the evidence in support of the intermediate boundary is not sufficient to warrant substituting it for the line described in the November 20, 1961, report of plaintiff’s consulting engineers.

 In support of the proposition that treaty ambiguities are to be construed in favor of the Indians, plaintiff cites the following cases: Squire v. *406 Capoeman, 351 U.S. 1, 6 (1956); Winters v. United States, 207 U.S. 564, 576 (1908). The general principle urged by plaintiff is undoubtedly a Bound one,, but it is of no avail to plaintiff in this case. As stated above, plaintiff has, failed to prove that either the boundary which would include Horse Prairie, or the intermediate boundary line should be adopted.

 60 Stat. 715.

 48 Stat. 984 (1934), as amended, 25 U.S.C. §§ 461-79 (1964),

 A meander corner marks a meander line which Is established by a survey to define the normal high-water mark of a body of water, where the vegetation ceases and the shoreline starts. Mr. Morrison and Mr. Bandy found, “a number” of meander corners with at least one identifiable marker on each of the four sides of Flathead Lake, including a stone meander corner which had been set on the west side of the lake by Mr. Harrison in 1887.

 Markers for these points were set with great precision.

 A surveyor’s chain is 66 feet long.

 On cross-examination, Mr. Osborne testified that the errors in these surveys were well within the standards for acceptance of error and were “good surveys.”

 The position of Mr. Morrison, plaintiff’s expert, on this point appears in finding 6(b), supra.

 Mr. Osborne conceded that if the location of the northern, boundary of the reservation as found by Mr. Harrison in 1887 was in error to the extent claimed," by plaintiff, then the error would be roughly twice as great as an error accept-able under the standards of the surveying profession.